Cite as 2026 Ark. App. 148

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CR-25-264

| | | |
|---|---|---|
| FARD MUHAMMAD | | **Opinion Delivered** March 4, 2026 |
| | APPELLANT | |
| | | APPEAL FROM THE ASHLEY COUNTY CIRCUIT COURT [NO. 02CR-24-137] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE CREWS PURYEAR, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## BRANDON J. HARRISON, Judge

Fard Muhammad appeals his misdemeanor conviction for third-degree battery. The same jury acquitted him of first-degree terroristic threatening, a Class D felony, Ark. Code Ann. § 5-13-301 (Repl. 2024), after a trial where Muhammad represented himself. He argues on appeal, through appointed counsel, that the record did not establish a knowing and intelligent waiver of his right to counsel under *Faretta v. California*, 422 U.S. 806 (1975), and the Arkansas precedent applying it. We disagree and affirm.

Muhammad was a custodian at Ashley County Medical Center. He was charged with punching and threatening to kill his supervisor in July 2024 during an argument about why he was waxing the floor during a shift change. At arraignment, he told the circuit court he has a third-grade education. He was living in a minivan. He did not disclose any

previous experience with the criminal justice system.[1] And from the outset, Muhammad said, politely and consistently, that he wished to represent himself.

The circuit court's efforts to ensure Muhammad's waiver of his right to counsel was knowing and intelligent—and to persuade him to accept counsel without violating his right to refuse it—were exemplary.[2] They leave no doubt that Muhammad knew what he was doing in the sense *Faretta* requires—even though he admitted, then demonstrated, that he did not know what he was doing in the technical criminal-procedure sense. Because the circuit court's finding that he made a knowing and intelligent waiver was not clearly against the preponderance of the evidence, *Shabazz*, 2018 Ark. App. 399, 557 S.W.3d 274, we affirm.

At the September 2024 plea and arraignment, after advising Muhammad of the charges he faced and the penalties that might apply, the court asked if he understood "there's rules of evidence, there's rules of criminal procedure, there's certain things that you have to follow during a jury trial as far as how to make objections, how to pick a jury, jury instructions, things of that nature." He responded, "No, I don't understand all that." He said he could do his best to get prepared.

The court informed him that he had a right to appointed counsel at no cost and that a lawyer would know how jury selection, trial objections, the rules of evidence, and the

---

[1]Muhammad admitted in his sentencing testimony that he had been to prison in Wisconsin on an escape charge. Because the circuit court did not know that when it let him proceed to trial without counsel, we do not consider it in this analysis. *Shabazz v. State*, 2018 Ark. App. 399, at 11 n.1, 557 S.W.3d 274, 280 n.1.

[2]Judge Crews Puryear handled the pretrial proceedings; Judge Robert B. Gibson III filled in at trial because Judge Puryear was sick with the flu.

2

rules of criminal procedure worked. Muhammad acknowledged, but declined, those advantages. The court warned it would have to hold him to the same standards as a lawyer, and would not be able to advise him to object if, for example, the State tried to bring in inadmissible evidence. Further, it warned that if he became frustrated by the court's rulings, the jury might hold his courtroom behavior against him. Muhammad said he understood. The court asked whether, knowing all that, he still wanted to proceed without counsel. He said yes.

That's not all. The court read from written waiver forms that acknowledged Muhammad knew he had a right to free appointed counsel and was declining anyway. One form included thoughtful warnings such as, "You don't have experience in the legal system to compare your case to, so the opinions you have may not be firmly rooted in reality." It explained the education and knowledge a lawyer has, including "how to make a record for appellate review of any errors that may arguably be made by the court or the jury at your trial." It also informed Muhammad that this experience would allow the lawyer to give an opinion Muhammad could consider in making "choices the law requires you to make in your case," including whether to testify or plead guilty. The other form told Muhammad that, despite the waiver, he could change his mind and ask for counsel any time before trial:

> *I understand further that this Court will not continue further in this proceeding until counsel is provided if I request it*, and knowing this, I hereby voluntarily and with knowledge of the above rights, waive counsel. *I further understand that my waiver of counsel at this time shall not preclude me from claiming a right to counsel in future proceedings in this cause, and I have been so informed orally of this by the court.*

3

(Emphasis added.) The court reiterated orally that "right now you're waiving counsel, but you understand at any future pre-trial settings you do have the right to request counsel if you change your mind?" Belt and suspenders.

Muhammad said, "All right." At an October 21 omnibus and bond-reduction hearing, the court asked if everything was "going okay" with his self-representation. Muhammad replied, "So far." The court allowed him to make an oral motion for discovery and told the State to get the discovery to him by the November 25 pretrial conference. At that conference, the court asked if Muhammad had questions about the trial process or "about jury selection and how that process will work?"

Muhammad replied, "How does it work?"

The court gave a thorough explanation. It concluded with this exchange:

THE COURT: Do you have any questions for me about that?

MUHAMMAD: No.

THE COURT: And you do acknowledge that I've -- several times tried to encourage you to have counsel represent you in this case?

MUHAMMAD: You have.

THE COURT: Sir?

MUHAMMAD: You have.

THE COURT: And you've declined that request?

MUHAMMAD: I have.

THE COURT: And you still wish to proceed pro se on this matter?

MUHAMMAD: Yes.

4

Six days before trial, at a pretrial hearing, the State made a record of an offer to let Muhammad plead guilty to third-degree battery in exchange for three years' probation. The court asked Muhammad if he wanted to speak to a public defender about the plea offer or any questions about trial, or to have standby counsel at trial to answer his questions then. Muhammad said no. The State invited him to make a counter plea offer. He responded:

> I assaulted Ms. Winston with a lot of bad words. That's what I did. I don't know what your fees, or fines, or punishments, are for calling people out their names, but that's all I'm guilty of. I'm not guilty of threatening Ms. Winston, or putting my hands on her in any way shape or form. That's the only offer I will stick with, so whatever punishment I have is more disrespect.

(His testimony at trial was the same.) The court again offered standby counsel:

THE COURT: Again, I can offer you standby counsel that would assist you with questions you may have, or the process of how this trial may work, but I understand that you are rejecting that offer. Is that correct?

MUHAMMAD: Yes.

THE COURT: Okay. I don't know how many more times I can make a record. I think I've gone into detail how dangerous this can be and the pitfalls of representing yourself. You do acknowledge that, correct?

MUHAMMAD: I do.

We acknowledge facts that could (and did) raise concern. For example, though a lawyer might have been proud of the verdict (acquitted of the felony, sentenced for the misdemeanor to about time served), Muhammad was not much of an advocate for himself at trial. He wore his orange jumpsuit from jail. He declined the court's offer to get him some street clothes after the jail lost those he had been arrested in. He was used to the jumpsuit, he said. In voir dire he asked one question: "Is there any one of you that don't

5

want to be here today? (Hands Raised.) That's all." He waived opening statement and called no witnesses but himself.

The altercation occurred in a breakroom. The State called three witnesses who saw or heard it: Sharee Winston, who was the complaining victim; Tina Carpenter, whom he called "her assistant"; and Janessa Stafford, a hospital employee who was in the breakroom at the time. This was Muhammad's testimony:

> On July 18th, after all — I'm just going to get right to the criminal offenses. I had given Ms. Winston my notice that I intended to quit. It was an immediate decision. She got upset. She called me a bunch of racial derogatory names. She used the word "nigger." Of course, I got upset, and I did start calling her a bunch of names. She directed her assistant to call the police. The assistant ran out of the room. I handed Ms. Winston my keys and my badge. She continued on with her insults, and I continued back at her with insults.

> She ran to the phone. She tried to pick up the phone, and back up with the phone, and as she backed up with the telephone, the telephone was pulled out of the wall by the cord. It's a standard push button phone, it's not a cell phone or anything to that nature. Phone fell to the floor. She tried to hoist herself over a chair that Ms. Janessa Stafford was sitting in — and by putting her hand on the back of her chair, and the back of the metal supply cabinets that is here and listed in the picture. She then picked up this blue office chair and tried to throw it at the defendant. Tried to throw it at me, and it landed on the table and knocked Ms. Stafford's computer to the floor.

> She then ran to the end of the table, tried to pick up another chair. I do believe that's it right there, and she attempted to throw that one, but I did rush her and grab that chair and that chair did subsequently fly across the room.

> The table had been pushed out right before this nightstand here, where time clock is sitting on top of Ms. Winston ran to the table. She tried to hoist herself over that table by placing her hand on the nightstand and the table. I was trying to grab her arm in the event that she was trying to go for another chair, but I ended up grabbing her foot and she ran out of the door.

That is my testimony.

A brief cross-examination followed:

PROSECUTOR:     Did you threaten to kill her if she called the police?

MUHAMMAD:     No, sir, I did not.

PROSECUTOR:     Okay. Did you punch her in the side of the head?

MUHAMMAD:     No, sir, I did not.

When asked if he wanted to respond to the State's closing argument, he replied, "No, sir, Your Honor. I've said what I need to say."

The jury returned a verdict in twelve minutes convicting him of misdemeanor third-degree battery and acquitting him of the felony. It fixed his sentence at six months in the county jail and no fine.

The circuit court informed Muhammad that he had the right to appeal and to request counsel for appeal. He again declined:

THE COURT:     [W]e are through with the trial. Appellate work is a different, it's a different burden. Do you — you are still indigent. You've elected to represent yourself thus far. I'm not encouraging you or discouraging you from appealing. It's your right. My question is, do you want me to appoint counsel at this time to examine — so that you can examine filing for appeal purposes?

MUHAMMAD:     No, sir.

THE COURT:     Okay. I just want to — are you sure?

MUHAMMAD:     Yes.

THE COURT:     Okay. I just wanted to make sure that you understood that I will do that right now if you want someone to talk to about filing an appeal. Okay? Do you understand that?

MUHAMMAD:     Yes.

| | |
|---|---|
| THE COURT: | Okay. If you change your mind, you would need to notify the Court and probably file a written motion that says "I would like counsel;" okay? |
| MUHAMMAD: | All right. |
| THE COURT: | I am unsure of the law and where it goes, because this is a rather unique circumstance. It doesn't always happen. But that would be my suggestion to you if you wake up in the middle of the night and you want to do it, that you put it in writing and you get it filed in this case so that Judge Puryear is notified of it; okay? And that he could take the steps to appoint counsel so that you can make a decision on whether or not you want to appeal or have counsel appeal your case; okay? |
| MUHAMMAD: | Yes. |

A written request for counsel dated December 12 was filed December 18. This appeal followed.

★ ★ ★ ★

Of the three considerations our supreme court has prescribed for allowing a criminal defendant to represent himself, *Jarrett v. State*, 371 Ark. 100, 104, 263 S.W.3d 538, 541 (2007), only one—whether there has been a knowing and intelligent waiver of the right to counsel—is a real issue on these facts. "Significantly," we have held, "every reasonable presumption must be indulged against the waiver" of that fundamental right. *Mattingly v. State*, 2025 Ark. App. 461, at 8, 721 S.W.3d 819, 824 (cleaned up). A request to waive counsel "must not leave any doubt that the waiver of counsel is what the defendant wants." *Madison v. State*, 2025 Ark. App. 273, at 16, 712 S.W.3d 765, 774 (citing *Reed v. State*, 2017 Ark. 246, 524 S.W.3d 929). But a decision to waive the right to counsel can be "knowingly and intelligently made" despite being a bad idea. It almost always *will be* a bad idea. What

8

the Sixth Amendment requires is proof the defendant knew it was a bad idea, and why, but made it anyway. The inquiry is a holistic one, and the outcome depends on the facts and circumstances of each case. *Reed*, 2017 Ark. 246, 524 S.W.3d 929.

In *Yarberry v. State*, 2026 Ark. App. 40, we reversed on a *Faretta* issue where the State conceded that the right to counsel had been violated. Though the circuit court had confirmed the defendant wanted to proceed pro se, it had not informed him first of the "advantages of having a lawyer and the dangers and disadvantages of going to trial without one." *Id.* at 3. At his request, we prepared and attached a model inquiry to assist future courts presented with a *Faretta* issue. *See id.* at 5 app. A. But we warned the model inquiry might not be necessary or even sufficient in every case. This one illustrates well why that is so.

In *Faretta*, the Supreme Court of the United States followed the "nearly universal conviction" among the courts that "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." 422 U.S. at 817. He must be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). But in that analysis, the defendant's "technical legal knowledge, as such" is not relevant. *Id.* at 836.

If there is a typical defendant in these appeals, it is one who has firm but delusional ideas about the law and doubts the loyalty or relative competence of appointed counsel, perhaps because he doesn't share them. *E.g.*, *Madison v. State*, 2025 Ark. App. 273, 712

9

S.W.3d 765. That was not Muhammad. He acknowledged a lawyer would know how the trial process worked, and he himself did not know. He acknowledged that knowing those things was important. He just didn't want a lawyer. The circuit court did nothing but discourage him from representing himself. It did not, for example, force him to choose between a quick trial without counsel or a delayed trial with one, as the circuit court had in *Shabazz*, *supra*.

To the contrary, the circuit court told Muhammad he could request counsel at any time, and offered repeated chances to change his mind.[3] We find somewhat probative that Muhammad declined to request counsel even as the progress of the case through discovery and the circuit court's exhaustive explanations of the trial process must have brought home some of the disadvantages of proceeding pro se. As we alluded to earlier, this record is a standout effort by a circuit court. The ultimate choice on self-representation was, in the end, Muhammad's to make.

Affirmed.

VIRDEN and BARRETT, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.

---

[3]Though we can imagine facts on which this assurance could seem like a temptation to waive counsel at an early but critical stage by minimizing the consequences, (1) that was not the case here, and (2) we highly approve of this practice in general.